## STATE v PEER et

Ohio Appeals, 9th Dist, Lorain Co.

No. 914. Decided May 3, 1939.

Howard R. Butler, Pros. Atty., Elyria, for appellee.

Adams & Adams, Elyria, for appellants.

## OPINION

PER CURIAM:

The defendants in the trial court, William Peer, David Crawford, Sr., David Crawford, Jr., Stanton Hobbs and Harry Ziegman, were indicted by the grand jury of Lorain county, in the April, 1938, term thereof.

The indictment in the first count charged the defendants with "unlawfully, fraudulently and corruptly" of-' fering to pay to William F. Grall, the¹ sheriff of Lorain county, the sum of $2.50 a week for each slot machine a gambling device, "to be exhibited for' gain" by the defendants named, in Lorain county, and to "influence the said William F. Grall, * * * sheriff aforesaid, to permit" the named defendants to exhibit, in Lorain county, gambling devices, to-wit, slot machines, for gain, in violation of law.

The second count of the indictment charged the defendants with actually paying the sheriff named above, $2.50 a week for each slot machine exhibited for gain by the defendants in Lorain county, to influence the said sheriff with respect to his official duties in permitting the defendants to exhibit the said slot machines for gain in Lorain county, in violation of law.

The indictment was bottomed upon the statute pertaining to bribery, §12823 GC.

Each of the defendants entered a plea of not guilty. A jury trial was held. A verdict of guilty on both counts was returned against four of the defendants. The jury found David Crawford, Sr., not guilty. A motion for a new trial was filed, heard and overruled by the trial court, and a judgment of guilty of the offense charged in the indictment was entered upon the journal of the court against the defendants William Peer, David Crawford, Jr., Stanton Hobbs and Harry Ziegman. From this judgment the cause is now in this court on appeal on questions of law.

The facts in the trial were in most respects undisputed. For the purpose of this opinion it is advisable to set out

in narrative form briefly an outline of the official corruption as revealed by the evidence.

William F. Grall was elected sheriff of Lorain county in 1936, and assumed the duties of his office in January, 1937. The four defendants owned and operated slot machines for gambling purposes in various locations in the county.

Shortly after Grall commenced his term of office, slot machines owned by some of the defendants were confiscated by the sheriff's deputies. Likewise, certain persons who exhibited the machines were arrested and prosecuted. Following these experiences there was an uncertainty among the defendant operators as to whether they would be allowed to continue the exhibition of their machines. On several occasions some of the defendants talked to chief deputy William G. Smith for the purpose of ascertaining the attitude of the sheriff's office in the exhibition of their gambling equipment, and requested the privilege of continuing to operate. The chief deputy reported the requests to his immediate superior, the sheriff. Specifically he testified:

"I told Grall (the sheriff) that these people were to see me and I told him on several occasions, at different times, and finally, just before the meeting, he decided, or he told me, that, I don't know, don't remember whose suggestion it was, but he told me that calling them all together would probably be the best way out of it, to decide what would be done."

Following this conversation, the chief deputy and a special deputy sheriff, Alfred G. Bauer, arranged for a meeting at the Bauer home. Invitations were extended to the operators named in the indictment. They all attended, with the possible exception of William Peer, who, if not actually present, was represented by a friend. The sheriff's office was represented by deputies Smith and Bauer. It was there agreed that the operators would pay the deputies $2.50 a week for each machine exhibited. Locations for the machines were likewise discussed, and awarded to the different owners present. The defendants were instructed that any agreement reached at this meeting was subject to the approval of the sheriff. In due time the result of the meeting was communicated to the sheriff through his chief deputy, Smith. The sheriff, after making certain changes in the locations allotted, approved them and likewise approved the amount of the payment. It was further agreed at the meeting that in consideration of the payments to be made, the sheriff's office would not confiscate any of the defendants' machines; that if complaints were received by the said office, the owners would be notified in sufficient time to remove their equipment before a raid; and further that if "outside persons" attempted to encroach upon the territory alloted to these defendants, their machines would be confiscated.

Following the events set forth above the defendants' machines were placed in operation, the money paid to the deputies and the protection given. The money was divided in the following manner: Bauer, 15% of the total amount received; the remaining 85% was divided 60% to the sheriff, and 40% to Smith, the chief deputy.

For more than a year the plan continued. The slot machines were operated, unmolested by official interference, and the money was collected and divided according to the agreement. Finally it abruptly stopped A grand jury, with a militant foreman, had secured some evidence of the situation, and, upon the recommendation of the grand jury and the prosecuting attorney, and with the approval of the Court of Common Pleas, immunity was granted to the sheriff and his deputies Smith and Bauer, under favor of §12824-1 GC. Whereupon they testified before the grand jury and in the trial of the instant case. Their testimony, as revealed in the record, explicitly and clearly depicts the affair.

Each of the defendants convicted testified in his own behalf. They admitted the ownership and operation of the

machines, denied any community of interest in their operations, and claimed that they were competitors. They testified that prior to the incumbency of Sheriff Grall they had displayed the machines in various locations, and that immediately subsequent to the sheriff's assumption of office the deputies Smith and Bauer planned a campaign of "extortion" against them; that the first step in the plan was to cause raids on their places of display, after which they were to be called together and an agreement reached whereby they were to pay the deputies for the privilege of operating. They further urged that they were dealing only with the deputies, and that the name of the sheriff was never mentioned. A statement in the defendants' brief (p. 4) sets forth their construction of their evidence in the following language:

"* * * we claim that a fair construction of the evidence is that he (Bauer), in the presence of deputy sheriff Smith, issued an ultimatum to the four defendants in substance as follows: 'That it was the intention of the Grall administration to have slot machines; that they knew that the defendants had operated and owned slot machines; that they could continue operating said slot machines if they would pay to Al Bauer, the sum of $2.50 per machine per week, and that, in the event of their refusal to pay, their machines were to be confiscated and they were to suffer for having operated them during the period prior to the raid which was conducted.' (That) no mention was made at that time or at any other time of any protection to be given by the sheriff of Lorain county and his office, and * * * that all these parties had in mind * * * (was) that Smith and Bauer would exercise whatever political influence they possessed, and that the sheriff's name was never at any time mentioned * * *."

The brief further sets forth (p. 5):

"It is admitted that none of the defendants ever saw or talked to sheriff Grall about slot machines and we believe the record indicates that it was the understanding of each and every one of them that this was merely a political gesture of liberality on the part of the officials, indicating that they intended to continue a liberal policy, which had been in effect in the county for years, and which the officials believed the public wanted; and that Mr. Bauer, who was not in any sense a public official within the purview of §12823 GC (bribery statute), was himself 'cashing in' on his political influence and activities."

The defendants testified that they had "no thought of bribing the sheriff"; that undoubtedly the sheriff received part of the money paid to Bauer, but they did not know "that he was receiving it." They specifically denied that the sheriff was given any money in return for "official favor," and denied further that they ever intended to influence him or his deputies with respect to their official duties.

The defendants predicate their plea for a reversal of the judgment of conviction upon fourteen separate assignments of error. For the purposes of convenience, those discussed will not be considered consecutively.

Second assignment: "For irregularities in the selection of the jury * * * by the jury commission, in this, to-wit, that one of said jurors, to-wit, Catherince Le Pouce, was improperly placed on said jury list and had, in fact, six weeks jury service within a year previous to the opening of the trial * * *. That two other members of the jury, to-wit, Melvin Maddock and Gwendolyn Wagner, had served as jurors at frequent intervals for most of the previous year * * *."

There is nothing in the record of the case to substantiate the above claims. This court does not take judicial notice of the annual jury lists prepared by the jury commissioners and filed with the clerk of the Common Pleas Court under §11419-9 et seq, GC, nor does it take judicial notice of the length of

time of service of particular jurors in the Court of Common Pleas.

Third assignment: "For misconduct on the part of the prosecuting attorney and the court in the improper submission of evidence, arguments and statements prejudicial to the defendants."

Eleventh assignment: "For misconduct of the prosecuting attorney in argument and remarks."

It appears that at the start of and throughout the trial, 69 slot machines were placed in the court room in the presence of the jury. Some had been confiscated from a store room under the control of the defendant Hobbs. All were owned by him. The prosecution offered in evidence all of the machines. The court admitted three of the number. Counsel for the defense complain of the "slot machine display" in the court room after their objection to them during the trial. They do so in the following language (p. 8):

"Throughout the entire trial the prosecutor did everything in his power to influence the jury and prejudice them * * *. Four of the defendants admitted that they owned and operated slot machines, and one of the defendants, Stanton Hobbs, admitted ownership of the machines on display in the court room. There was therefore no possible purpose in exhibiting the machines but to deliberately attempt to prejudice the jury."

An attempt to prejudice a jury by bringing before it evidence known to be incompetent, with the design and purpose of influencing the jury in favor of one side and prejudicing it against the other, constitutes misconduct, and may amount to prejudicial error. However, a litigant is not precluded from offering evidence in the trial of a case which is competent, "merely because of its tendency to appeal to the prejudices rather than the reason of the jury."

In the instant case there is nothing in the record to indicate that at the start of the trial the ownership and operation of slot machines was admitted by the defendants, nor that the defendant Hobbs admitted ownership of the machines offered in evidence by the state. It is true that during the admission of evidence by the defendants they made such admissions, and it may be that during the admission of evidence by the state some similar admissions were made by counsel for defendants, but the state was entitled to prove its case, and so long as facts pertinent to the prosecution were not conclusively established or admitted, they were open to further proof by evidence which should not be excluded merely because it was cumulative. The plea of "not guilty" had controverted the the existence of every fact necessary to constitute the crime of bribery as charged in the indictment. The court charged the jury that they should not consider the evidence as to said slot machines except as against the defendant Hobbs, and that such evidence should not be considered for any purpose as against the other defendants.

We are of the opinion that the trial judge did not abuse his discretion in the respects claimed, nor that prejudical error intervened as claimed, nor that the jury was prejudiced thereby. In fact, the judge under the circumstances could, in his discretion, have admitted in evidence most of the machines offered by the prosecution as against the defendant Hobbs.

It further appeared that one of the slot machines admitted in evidence and owned by the defendant Hobbs had been adjusted in such a manner that it paid something less in percentage on the amount of money played into it than the ordinary normal machine. In other words, that it had been, in the vernacular of the trade, "plugged".

The prosecuting attorney commented on the condition of the machine in argument to the jury and drew certain inferences therefrom. The trial court sustained objections to the comment, by the prosecuting attorney, on the "mechanical condition" of the machine.

Claim is made that, even though the court sustained objections thereto. the prejudice remained. Further claim is made that other argument to the jury was erroneous, unfair and prejudicial.

The record does not reveal the argument of defense counsel, nor does it give the entire closing argument of the prosecution. Suffice it to say that the scope of a closing argument depends somewhat upon the character of the argument which preceded it. We are not favored with a report of the argument of defense counsel. Considering the language used by the prosecuting attorney, the evidence in the case, and the court's remarks. we are not of the opinion that the verdict was erroneously rendered under the influence of the remarks of counsel. We find no prejudicial error in the claimed errors numbered 3 and 11, supra.

Fourth assignment: "For the reason that the indictment upon which said cause was tried, was in fact no indictment and was improperly amended by the court and the prosecuting attorney, to the prejudice of these defendants, and in contravention of the laws of the State of Ohio, and in derogation of the constitutional rights of these defendants."

**Sec. 13437-2 GC,** provides:

"The indictment or information is sufficient if it can be understood therefrom: * * *

"4. That an offense was committed at some place within the jurisdiction of the court, except where the act, though done without the local jurisdiction of the county, is triable therein."

**Sec. 1437-29 GC,** provides for the amendment of indictments and procedure thereafter.

A consideration of the indictment as returned by the grand jury before amendment, charged, we believe, the existence of a corrupt intent upon the part of the accused to bribe and in actually bribing the sheriff of Lorain county, and to thereby influence him in respect to his official duties by influencing him to unlawfully permit the defendants to carry on their unlawful business. We are of the opinion that the indictment as returned by the grand jury charged the offense of bribery within the purview of the statute, and that the amendment merely amplified the original charge. The accused could not have been misled nor prejudiced by the indictment before or after amendment. It is true that the original indictment did not use the exact language of the statute, to-wit, "to influence him (the sheriff) with respect to his official duty"; however, an indictment is not defective if the requisite allegation can be **Headnote 5.** reasonably inferred from other allegations contained therein. We find no error prejudicial to the rights of the accused in this claim.

Tenth assignment: "For refusing to charge said jury as requested by the defendants"; particularly "4. To define the terms 'extortion' and 'blackmail'."

It was claimed by the defendants throughout the trial that, although they owned and operated slot machines in Lorain county and paid their money according to agreement to the collector, the money was not paid with the intent of influencing the sheriff in respect to his official duties, but that the defendants actually were victims of "extortion and blackmail" at the hands of deputy sheriffs Smith and Bauer.

**Sec. 12916 GC,** on the subject of extortion, provides:

"Whoever, being an officer under the constitution or laws of this state, knowingly asks, demands or receives a reward, other than is allowed by law, to execute his official duty, or knowingly charges, asks, demands or receives greater fees or costs than are allowed by law for such official duty, or engages in, or permits another in his employ to engage in a business, which by reason of his office, he is prohibited from doing, shall be fined * * * or imprisoned * * *."

The defense claim is that deputies Smith and Bauer were the extortioners. Even if they were officers under "the constitution or laws of this state," they did not ask, demand or receive a reward to **execute** their █ official duty. In fact, they took a reward for themselves and their superior, the sheriff, to **not** enforce the law which they were duty bound to enforce.

It would have been error to have charged the jury on extortion.

Sec. 13384 GC, on the subject of blackmail, provides:

"Whoever, with menaces, orally or by written or printed communication, sent or delivered by him, demands of another a chattel, money or valuable security, or accuses, or knowingly sends or delivers a written or printed communication, with or without a name, or with a letter, mark or designation, accusing or threatening to accuse, another of a crime punishable by law, or of immoral conduct, which, if true, would tend to degrade and disgrace such person, or threatening to expose or publish any of his infirmities or failings, or to subject him to the ridicule or contempt of society, or to do any injury to the person or property of another, with intent to extort or gain from him a chattel, money or valuable security or a pecuniary advantage, or, with intent to compel him to do an act against his will, may be fined * * * and shall be imprisoned * * *."

It is claimed that Smith and Bauer threatened to do an injury to the property of the defendants, with intent to gain from them money and with intent to compel them to do an act against their will. The injury of which complaint is made is the threatened confiscation of their slot machines, which are gambling devices per se, and their threat to enforce the law as against them if they continued to violate it.

Without further discussion, this court categorically rules that the claimed in-juries of the defendants █ are not injuries to property within the scope of the blackmail statute. The giving and receiving of bribes, preceded by a threatened enforcement of the law unless the bribe is given, does not constitute blackmail. It likewise would have been error to have charged on the subject of blackmail.

In our judgment, the most favorable claim that can be made by the defendants with reference to the transactions shown by the evidence, is that deputies Bauer and Smith solicited the bribes which the evidence discloses was thereafter in part paid to the sheriff, Grall; and we hold that it is no █ defense to the payment of a bribe to prove that it is solicited by the person to whom it is paid.

Seventh assignment: "For the reason that the verdict was not sustained by sufficient evidence and is contrary to law."

On the claims of the defendants that they did not agree to pay the money to the sheriff, that they did not expect that the sheriff would be influenced in his official capacity by the money paid by them to his deputies, and that they did not know that any of the money paid by them was being received by the sheriff or that the sheriff, acting in his official capacity, was affording them any protection, the jury found against them.

After reading the entire record, with especial attention to the reasonable and logical inferences to be drawn from the established facts, this █ court cannot say that such finding is manifestly against the weight of the evidence.

"In a criminal prosecution, questions of fact are for the jury. and a judgment of guilty will not be reversed as not sustained by sufficient evidence unless the verdict and judgment are clearly and manifestly contrary to the evidence."

Scaccuto v State of Ohio, 118 Oh St 397.

Whenever, from a combination of circumstances as revealed by the evidence, it becomes necessary to determine an ultimate fact or ultimate facts, upon the determination of which reasonable minds might reasonably arrive at different conclusions, it is the province of the jury to perform that function and to draw from the proven facts and circumstances such reasonable and logical inferences as may be pertinent thereto; bearing in mind. however. the degree of proof by which ultimate facts must be shown in a criminal case.

In the instant case the jury, having all the facts before it, exercised its judgment under the guidance of a charge of the court which fully and accurately set forth the rules of law by which their deliberations were to be governed.

We have examined the other errors assigned, and we find no error prejudicial to the substantial rights of the defendants in any of them.

Judgment affirmed.

WASHBURN, PJ., DOYLE, J., and STEVENS, J., concur.